## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOLORES ASTACIO, KINETTA BERRY, PETERLYNN JAMES, and ADRIAN SALAS, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, and LOUISE CARROLL, | |
| Defendants. | |

Plaintiffs Dolores Astacio, Kinetta Berry, Peterlynn James, and Adrian Salas ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge as to facts pertaining to themselves and on information and belief as to all other matters, by and through their undersigned counsel, bring this class action complaint against defendants City of New York ("the City"), the New York City Department of Housing Preservation and Development ("HPD"), and Louise Carroll (collectively "Defendants").

## NATURE OF THE ACTION

1.      The Mitchell-Lama program was created in 1955 to provide affordable rental and cooperative housing to moderate-income families.

2.      The Mitchell-Lama program is administered and overseen by defendant HPD, and by the State of New York.

3.      Despite the importance of the Mitchell-Lama program to tens of thousands of middle-class New Yorkers seeking reasonably priced housing, the City, HPD and its leadership

have failed for years to assure that the program is administered in a fair manner consistent with the law and the requirements of due process.

4.      Prospective tenants and members of cooperatives are eligible to rent or purchase a Mitchell-Lama apartment if their income falls within prescribed limits and the number of people in the household meets the occupancy standards for the unit.

5.      Individuals interested in the program apply to specific Mitchell-Lama developments while providing an application fee.  If space is available, or if selected through a lottery process, applicants may then be placed on a waiting list at the development.  Then, as vacancies in a development occur, the next applicant on the waiting list is required to be offered and awarded the unit, after an application process and approval by HPD.

6.      Plaintiffs obtained places on waiting lists at Mitchell-Lama developments after having paid their application fee.  They were then later removed from the waiting lists and denied apartments on the ground that they failed to respond when contacted about an open apartment.  In fact, Plaintiffs were never contacted regarding openings at the developments nor provided any notice that they were being removed from the waiting list.

7.      HPD has been repeatedly criticized for its failure to ensure that applicants are offered units in the order in which they were placed on the lists and are not arbitrarily passed over when their turn arises.  This includes a recent audit by the New York State Office of the State Comptroller finding that applicants in a number of sampled developments, including Cadman Plaza where plaintiff Silas applied, were removed from waiting lists due to purportedly failing to respond when contacted about open apartments despite no actual contact having been attempted.

8.      The City, HPD and its leadership were well aware of these and other failures in the procedures they mandate and oversee but have done almost nothing to prevent Plaintiffs and others on the waiting lists from being improperly passed over and denied Mitchell-Lama units.

9.      The City and HPD have been deliberately indifferent since at least 2009, if not earlier, to the persistent, repeated failure of management companies at Mitchell-Lama buildings to adhere to the procedures for allocating apartments to middle class families, and have failed consistently to enforce the program guidelines which are intended to ensure fairness in the allocation of Mitchell-Lama apartments.

10.     As a result of Defendants' deliberate indifference to these reckless practices, and as a result of Defendants' failure to implement and monitor the Mitchell-Lama program, Plaintiffs and other applicants who were removed from the waiting lists without notice on the false ground that the management companies attempted, but were unable to contact them regarding open apartments, or who were removed for other specious reasons or otherwise not given the opportunity to apply for and to obtain apartments to which they were entitled (the "Class," defined further below) have been damaged in an amount to be determined at trial.

11.     Plaintiffs bring this action on behalf of themselves and all others similarly situated to recover the lost benefits attributable to Defendants' failure to implement and monitor the Mitchell-Lama program, and their denial of Plaintiffs' and the Class members' property rights without due process of law, as well as to obtain injunctive relief from the Court (1) ordering Plaintiffs and the Class to be reinserted into their respective waiting lists as the next in line to acquire the next available unit; and (2) requiring HPD to implement all procedures necessary to ensure that applicants on the waiting lists are provided required notice and offered units in the correct order.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

13.     Venue is proper in this District under 28 U.S.C. § 1391 because (1) Defendants engaged in substantial conduct relevant to Plaintiffs' claims within this District and have caused harm to members of the proposed Class residing within this District; and (2) a substantial part of the property that is the subject of this action is located in this District.

## PARTIES

14.     Plaintiff Dolores Astacio is a resident of The Bronx, New York.  Astacio was on the waiting list for a 2-Bedroom unit in Adee Tower until she was removed from the list without notice on the false ground that she did not respond when contacted about an available unit.

15.     Plaintiff Kinetta Berry is a resident of Mount Vernon, New York.  Berry was on the waiting list for a 2-Bedroom unit in Adee Tower until she was removed from the list without notice on the false ground that she did not respond when contacted about an available unit.

16.     Plaintiff Peterlynn James is a resident of Brooklyn, New York.  James was on the waiting list for a 3-Bedroom unit in Atlantic Terminal II until she was removed from the list without notice on the false ground that she did not respond when contacted about an available unit.

17.     Plaintiff Adrian Salas is a resident of Brooklyn, New York.  Salas was on the waiting list for a 1-Bedroom unit in Cadman Plaza North until he was removed from the list without notice on the false ground that he did not pay the required fee to keep his place on the waiting list.

18.     Defendant City of New York is a municipal corporation organized and existing under the laws of the State of New York.

4

19.     Defendant New York City Department of Housing Preservation and Development is a constituent agency of the City of New York with its principal place of business at 100 Gold Street, New York, New York 10038.

20.     Defendant Louise Carroll is the current Commissioner of the New York City Department of Housing Preservation and Development, and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### The Mitchell-Lama Program

21.     The Mitchell-Lama affordable housing program was created in 1955, under the auspices of the Limited Profit Housing Companies Act.

22.     Developers who participated in the program received tax abatements and low interest mortgages subsidized by the federal government and/or state and local governments, in exchange for constructing affordable housing within the City of New York.

23.     The tax abatements and low interest mortgages were available only to those developers who remained in the program.

24.     Developments in the Mitchell-Lama program are overseen either by the State Division of Homes and Community Renewal or HPD.

25.     Today, HPD oversees and implements housing regulations for approximately one hundred eighty-four (184) Mitchell-Lama buildings within the City of New York.

### The Mitchell-Lama Application Process

26.     In order to ensure fairness in the application process for apartments in developments overseen by HPD, the City has enacted rules and regulations which are set forth in Title 28, Ch. 3, of the Rules of the City of New York ("RCNY") (hereafter the "Mitchell-Lama Rules").

27.     HPD is required by law to ensure that all Mitchell-Lama developments follow the Mitchell-Lama Rules when offering apartments to the public for sale or lease.

28.     The Mitchell-Lama Rules provide, in pertinent part, that "[a]ny bona fide resident of the State of New York who has reached his/her majority under the laws of the State of New York may file an application for the lease of a dwelling unit in a rental housing company or the purchase of shares in a mutual housing company," subject to the payment of an application fee and other non-returnable fees for credit investigations, home visits or administrative costs.  (Mitchell-Lama Rules, §3-02(h)(2))

29.     The Mitchell-Lama Rules mandate that applications must be numbered in the order in which they were received or by lottery.   The rules also require that each Mitchell-Lama development keep a list of these applications indicating all applicants' numbers, names and addresses, and all actions taken with respect to each application.  Section 3-02(h)(3) provides in pertinent part that "[a]pplications shall be consecutively numbered and dated upon receipt by the housing company or shall be numbered pursuant to order of selection by lottery, as applicable. The housing company or its managing agent shall provide an applicant with a dated receipt or other form of documentation setting forth the date and/or waiting list number of the application."

30.     Section 3-02(h)(8)(i) further provides in pertinent part that "[a]ll housing companies, whether mutual or rental, shall maintain all waiting lists on forms approved by HPD for all tenant/cooperator applications for apartments, listed in chronological order, by apartment size, by date of receipt or by order of selection by lottery, as applicable …. These master waiting lists shall be kept in the management office.  A conformed copy of the master waiting lists by apartment size shall be sent to HPD.  Thereafter, on a semi-annual basis, or more frequently if requested by HPD, updated waiting lists shall be submitted to HPD.  The waiting lists must reflect

6

the status of each application, i.e. who received an apartment, who declined an apartment, who withdrew, or any other circumstances, including dates the actions were taken."

31.    Section 3-02(h)(12) mandates that "the waiting list by apartment size in chronological order by date of receipt of application or order of selection by lottery" must include the date of the application, applicant's name, address, home and business telephone numbers, and status as a veteran if applicable.

32.    The same provision unambiguously states: "Selections of tenants or cooperators *must* be made from this list in chronological order or order of selection by lottery, as applicable." (Emphasis added).

33.    The Mitchell-Lama Rules generally provide that apartments must be offered to the following groups in descending order of priority: (1) internal tenant/cooperators seeking a transfer within the same development; (2) veterans; and (3) persons on the external waiting lists.

34.    Section 3-02(i)(1), entitled "First priority," provides in pertinent part that "[t]enant/cooperators currently residing in a development whose household composition renders them eligible for a smaller apartment shall be given first priority for an internal transfer. Tenant/cooperators currently residing in a development whose household composition renders them eligible for a larger apartment shall be given first priority for the first three out of every four apartments that become available and the fourth such apartment that becomes available shall be set aside and offered to an applicant on the external waiting list …."

35.    Section 3-02(i)(2), entitled "Second priority," provides in pertinent part that "preference in admission to a project with an open waiting list, as determined by HPD, shall be given to persons who are veterans as such term is defined pursuant to § 85 of the Civil Service Law  or their surviving spouses, and for projects with a closed list, as determined by HPD,

preference shall be given upon the opening of the waiting list to such veterans or surviving spouses that are selected in the lottery for such opened waiting list."

36.     Section 3-02(i)(3), entitled "Third priority," provides in pertinent part that "[p]ersons listed on the external waiting lists by apartment size in strict chronological order by date of receipt of application or order of selection by lottery, as applicable."

37.     As apartments become available, each Mitchell-Lama building is required to notify applicants on the appropriate waiting list of that apartment's availability.

38.     After an applicant is selected from the appropriate waiting list, that applicant must submit a complete application setting forth their income and "family composition," e.g., the number of persons in their family who intend to occupy the apartment.  Mitchell Lama Rules, §§ 3-02(h)(9), 3-02(m), 3-03(a)

39.     Applicants who satisfy the occupancy standards, also known as "family composition" requirements, *see* Mitchell Lama Rules, § 3-02(m), and who satisfy the required income thresholds, are entitled to the apartment once it becomes available.

40.     If the applicant is offered the apartment and accepts, then they must occupy that apartment as their primary residence and may not sublet the apartment without HPD approval.  *See* Mitchell Lama Rules, §§ 3-02(n)(2), (4).

**HPD's Failures in Implementing and Monitoring the Mitchell-Lama Program**

41.     The City, HPD and its officers have for many years, since at least 2009, if not earlier, failed to enforce the foregoing Mitchell-Lama Rules, and other applicable rules, resulting in the denial of qualified applicants' property rights as provided under state law, without due process as the federal constitution requires and without notice to those applicants that they had been passed over for apartments to which they were entitled.

42.     The City has been on notice of these unconstitutional practices, more fully set forth below, but has taken no action whatsoever to remedy the practices or the injury such practices cause on a widespread, persistent basis.

43.     On or about August 29, 2005, the State Comptroller delivered to the Commissioner of HPD Audit Report 2004-N-8, addressing HPD's "efforts to monitor the maintenance of waiting lists by New York City Mitchell-Lama housing companies."[1]

44.     The objective of the audit was "to determine whether HPD's monitoring effectively ensures that the tenant selection process is performed in accordance with the [Mitchell-Lama] Rules" set forth in RCNY, Title 28, Chapter 3.

45.     The audit covered the two years preceding December 31, 2004.

46.     The audit found that HPD's efforts were "adequate overall," but nevertheless identified steps that HPD could take "to strengthen the integrity of the waiting lists."  For example, the audit found that "some tenants at two of the ten housing companies" visited by the auditors "had received apartments and were not on the waiting lists at all," including "an employee of the housing company's managing agent who had received an apartment improperly."

47.     The audit found that HPD "also needs to track the resolution of its own internal audit findings," a problem that continues to this day as described more fully below.

48.     The auditors reviewed HPD records for forty-nine (49) housing companies and found that thirty-four (34) of those companies, or sixty-nine percent (69%), had not submitted an updated waiting list to HPD within the past six months.

49.     HPD was unable to explain discrepancies in some of the lists, including the removal of applicants from one building's list.

---

[1] *Available at* https://osc.state.ny.us/audits/allaudits/093005/04n8.pdf.

50.     In addition, at one development (Boulevard Towers), the names of only five of the twenty most recent tenants appeared on the building's waiting list.  The managing agent claimed to auditors that applicants who had obtained apartments "had brought in a letter indicating that their names were on a previous waiting list," but the managing agent could not produce any such previous list.  The management company had reinstated these applicants to waiting lists without HPD approval, contrary to HPD rules.

51.     Upon information and belief, HPD took no meaningful action with regard to the information about Boulevard Towers reflected in the audit.

52.      The 2005 audit also found that the content of waiting lists at some buildings did not comply with the Mitchell-Lama Rules.  For example, the waiting lists at Luna Park and Brighton House did not include the date that applications were submitted, a major problem because the date "establishes the order of selection" of applicants for apartments.

53.     Auditors found that "[w]ritten comments on the waiting lists provide some explanations for skipping an applicant, but they are not always provided and some of them are incomplete."  In addition, auditors noted that "some new tenants in Boulevard Towers, Dayton Towers and Clayton Apartments had been selected from the waiting list ahead of previously-listed applicants; yet no comments or annotations had been added next to their names to explain why."

54.     The audit then set forth specific examples of tenants who apparently skipped ahead of others on the waiting lists without explanation and housing companies' inserting names into waiting lists on dubious, undocumented grounds.

55.     In 2008, the City Comptroller completed Audit MJ06-134A, which addressed "the adequacy of the monitoring and supervision of the award, transfer, and succession of apartments

at Mitchell-Lama developments by [HPD] to ensure compliance with Mitchell-Lama program regulations" during the calendar years 2004-6.[2]

56.    The audit concluded that HPD's monitoring and supervision "does not provide sufficient assurance that housing companies consistently comply with Mitchell-Lama Rules …." Among other things, "[d]ocumentation is not retained to verify that only qualified applicants are approved and awarded apartments," and "available vacancy reports, rent rolls, and waiting lists are not compared or reviewed regularly as a means to detect potential irregularities or other questionable matters that may require follow-up."

57.    The audit also criticized HPD's internal auditing, stating that HPD does not audit the housing companies "on a cyclical basis or with sufficient frequency to ensure the consistent compliance of housing companies with Mitchell-Lama Rules."

58.    The audit made fifteen (15) separate recommendations, of which HPD agreed with ten (10), partially agreed with one (1) and disagreed with four (4).

59.    The findings and recommendations of the audit included the following:

- HPD's monitoring and supervision of the award, transfer, succession and subsequent retention of apartments at Mitchell-Lama developments does not provide sufficient assurance that housing companies consistently comply with Mitchell-Lama Rules.  Therefore*, there is a greater than reasonable risk* that improprieties and irregularities in the granting and occupancy of apartments at Mitchell-Lama developments could occur and go undetected and uncorrected.

- Housing Supervision [one division of HPD] needs to enhance and strengthen its oversight and monitoring capabilities.  Our review determined that the divisions' internal processes are carried out informally, resulting in inefficiencies.  The Applications Unit does not retain documentation to support application approvals to verify that only qualified applicants are approved and awarded apartments, nor does it review available reports or spot check waiting lists on a periodic basis as a means to detect potential irregularities or other questionable matters that may require follow-up.

---

[2] *Available at* https://comptroller.nyc.gov/wp-content/uploads/documents/MJ06_134A.pdf.

- Housing Supervisions' Audit Unit carries out the audit function, which is the primary mechanism HPD uses to assess housing companies' compliance with Mitchell-Lama Rules after apartments are awarded and occupied by tenants. However, Housing Supervision lacks a formal, risk-based approach in developing its audit plan and does not perform application audits of housing companies on a cyclical basis or with sufficient frequency to ensure consistent compliance of housing companies with Mitchell-Lama Rules. Also, the agency lacks a formal system to log and track complaints, which is a concern since most audits are initiated by complaints.

(Comptroller's Audit MJ06-134A, at page 10; emphasis added)

60.     Auditors randomly selected three Mitchell-Lama buildings and selected a fourth based on a recent complaint, for the audit.

61.     They found multiple instances where applicants' names had been crossed off, skipped over or inserted onto waiting lists, without explanation.

62.     Auditors questioned HPD about the discrepancies, and HPD stated in response that their application reviewers, supposedly, examine waiting lists whenever applications for new apartments are submitted in order to ensure that applicants are appropriately selected.  However, HPD acknowledged that because it does not document their purported application and waiting list reviews, "there was no evidence from which to determine the depth or adequacy of the reviewers' investigations, or whether they were done at all."

63.     The audit recommends, among other things, that HPD should require "the periodic review, evaluation and comparison of vacancy reports, waiting lists and rent rolls as part of its routine oversight and monitoring activities to identify and address inaccuracies as deficiencies and investigate any reported discrepancies pertaining to the award, transfer and succession of Mitchell-Lama apartments."

64.     HPD disagreed with this recommendation, and upon information and belief, took no meaningful action to improve its operations as the audit recommended.

65.     HPD's own internal audits from 2012-17, moreover, confirm that serious problems exist in many Mitchell-Lama buildings, particularly with regard to the allocation of apartments to those persons on internal and external waiting lists.

66.     During that time period, HPD conducted forty-five (45) separate audits of different buildings.  The vast majority of audits found that apartments were improperly awarded and/or that succession rights were not properly followed – resulting in the denial of apartments to otherwise qualified applicants and the removal from the market of apartments that should have been made available to qualified applicants.

67.     Some buildings showed more egregious violations than others.  HPD found "serious irregularities" in Ruppert House between June 2011 and August 2015 with regard to internal transfers, waiting lists, succession rights, primary residence verification and other administrative procedures.

68.     HPD found "serious irregularities" in St. Martin's Housing Corporation between July 2010 and November 2015 with regard to succession rights, primary residence verification, non-availability of shareholders' records and other administrative procedures.

69.     HPD found "serious irregularities" in Rosalie Manning Corporation between April 2009 and August 2015 with regard to primary residence verification, non-availability of shareholders' records and other administrative procedures.

70.     HPD found "serious irregularities" in Esplanade Gardens between December 2011 and January 2017 with regard to succession rights cases and primary residence verification, among other things.

71.     Only two of the forty-five (45) audits found "no irregularities" and the majority of the others found "some" or "a few" irregularities with regard to primary residence verification, succession rights or other matters.

72.     The findings regarding succession rights are significant because if apartments are improperly awarded to individuals who claim succession rights, then those apartments are not being offered to those on waiting lists who are properly entitled to them.

73.     Similarly, the findings regarding primary residence verification are significant because if a tenant/cooperator occupies an apartment as other than their primary residence without HPD approval, then that apartment, too, must be vacated by the tenant/cooperator and offered on the market to the applicant whose name is next on the appropriate waiting list.  Housing companies' failure to verify that all tenant/cooperators occupy apartments as their primary residence effectively makes those apartments unavailable for occupancy by applicants who are otherwise entitled to them.

74.     Despite the results of HPD's own internal audits, upon information and belief, HPD did nothing to address the multitude of irregularities occurring on a persistent, widespread basis in virtually every Mitchell-Lama building that was audited.

75.     A subsequent audit in July 2015 by the State Comptroller entitled "The Mitchell-Lama Program: Awarding Housing Units and Maintaining Waiting Lists" revealed more evidence of mismanagement and misallocation of Mitchell-Lama apartments.[3]

76.     The purpose of the audit was to determine whether Mitchell-Lama-financed housing units were assigned to eligible persons in compliance with properly established waiting lists for the period January 1, 2012 through November 30, 2014.  The audit found a number of

---

[3] *Available at* https://osc.state.ny.us/audits/allaudits/093015/14n3.pdf.

discrepancies in the manner in which applicants on Mitchell-Lama waiting lists were purportedly contacted about reaching the top of the list.

77.     As part of the 2015 audit, confirmation letters were sent to 75 applicants at three sampled developments in order to determine whether their notations on the waiting lists were accurate.  The audit report's summary of the responses received demonstrated a system-wide failure of HPD to implement or enforce procedural protections for applicants on the waiting lists, including at Cadman Towers where Plaintiff Salas applied:

> **Cadman Towers** – We received three responses to confirmation letters sent to 15 applicants.  The three respondents disputed the notations on the list made by building management.  For two of the three respondents, the notation was "no response" – indicating that the applicants did not respond to management's query about their continued interest in Cadman Towers.  However, both applicants asserted that they did not receive any communication from management regarding their interest.  Because of the lack of supporting documentation, it is unclear what actually happened in these instances.  For the third respondent, building management noted that the applicant withdrew his/ her application.  However, the applicant disputed this, stating that the application was not withdrawn.  Again, management had no evidence to support its notation.

> **Trinity House** – We received 22 responses to the confirmation letters sent to 45 applicants.  Three of the respondents confirmed management's notations, and 14 disputed them. (We could not clearly determine whether the remaining five respondents confirmed or disputed the notations.)  We noted that 10 of the 14 applicants who disputed management's notations had "No Fee" written next to their names on the list, indicating that the applicants did not remit the $200 application fee.  Nine of these 10 respondents asserted that they were never asked to remit the fee, while the 10th applicant stated that she was asked to remit the fee and did so.  All 10 applicants indicated that they would have been interested in renting a unit at Trinity House.  Further, as previously detailed, several applicants who were lower on the Trinity House list than other parties were offered units and received them.

> **Washington Square Southeast** – We received four responses to the 15 confirmation letters sent to applicants.  One respondent confirmed building management's notations, two disputed them, and we could not readily determine the position of the remaining respondent.  One applicant disputed a "no response" notation next to her name on the list. The applicant indicated she was never offered a unit at the development, and she believed she was still on the list for a three-bedroom unit.  Building management did not have any documentation to evidence a letter was sent to this applicant.  Further, we noted that an applicant lower down on the list was awarded a three-bedroom unit prior to our inquiry. Thus, the applicant who disputed the "no response" notation may have been improperly

passed over for the unit.  The other disputing respondent questioned a notation that a request for continued interest had been "returned to sender."  In this case, however, building management had appropriate supporting documentation: the stamped letter that was returned by the post office.

78.     As part of the audit report, the State Comptroller made eight recommendations to attempt to correct the abuses in the system, including that HPD (1) require managers of housing developments/buildings to maintain appropriate supporting documentation for notations made to waiting lists; (2) ensure that waiting lists provide sufficient space to post and update notations regarding applicants' status, including continued interest in housing units; and (3) when awarding available units, prepare and maintain sufficient documentation of the reasons for awarding units to applicants other than the next available applicant on the waiting list.

79.     Nearly two years later, on March 23, 2017, the State Comptroller sent a letter summarizing its follow-up on the 2015 audit and assessing the extent of implementation, as of February 10, 2017, of the recommendations made in the State Comptroller's 2015 audit report."[4] Of the eight recommendations, the State Comptroller found that only half were fully implemented. For example, the State Comptroller's recommendation that waiting lists be modified to provide sufficient space for relevant information about wait list applicant's status was rejected by HPD as impractical:

> Using commercial software, HPD developed a spreadsheet which provides sufficient space to post and update notations regarding applicants' status and continued interest in housing units.  HPD has utilized this spreadsheet for the three waiting lists that have were recently established.  However, HPD officials stated that it was not practical to convert the existing hand-written waiting lists to the new spreadsheet system.  As a result, no changes were made to the pre-existing hand-written lists.  Because these waiting lists lack sufficient space to post and update notations, we continue to recommend that HPD ensure all waiting lists provide sufficient space for notations.

---

[4] *Available at* https://osc.state.ny.us/audits/allaudits/093017/16f25.pdf.

80.     In response to the State Comptroller's recommendation that managers of Mitchell-Lama buildings maintain supporting documentation for notations made to waiting lists, HPD apparently only issued a memorandum to managers setting out new requirements for record keeping.  There is no indication that HPD, like the State Comptroller, took any steps to assure that such requirements were actually followed:

81.     The State Comptroller also reported that HPD declined to implement the recommendation that HPD, when awarding available units, prepare and maintain sufficient documentation of the reasons for awarding units to applicants other than the next available applicant on the waiting lists.  Instead of attempting to reform these issues,

> In response to our initial report, HPD officials did not agree to prepare and maintain documentation for units awarded to applicants other than the next available applicant, and consequently, they did not implement the recommendation.  Instead, they stated they would require the developments to maintain the documentation, which they would review by placing a special focus on units that are awarded to applicants other than the next available applicant on the waiting list.  To determine whether HPD's practice was followed, we reviewed recent applicant approvals at Clinton Towers and York Hill, two HPD-supervised developments located in Manhattan.  We found the following:
>
> - Clinton Towers – HPD approved five applicants for one-bedroom units during the period January through October 2016.  However, there were 18 applicants on the waiting list ahead of the applicants who were awarded the units.  The waiting list had notations for the 18 indicating why each did not receive an available unit.  To ensure compliance with program rules, HPD staff should have reviewed the list and the related supporting documentation maintained by the development to explain why the 18 applicants were passed over for the units.  Nonetheless, HPD provided evidence they reviewed documentation to confirm the notations for only one of the 18 applicants.
>
> Further, we visited Clinton Towers to determine if management maintained documentation to support the notations on the waiting list.  However, management was unable to provide evidence to support any of the list's notations. (Note: Auditors found evidence to support a notation for one applicant during their documentation review.)  Lacking support documentation, we could not determine if there was sufficient justification for passing over nearly all of the applicants in question.  In addition, HPD officials told us that Clinton's previous housing manager resigned suddenly, and the new manager might not know where to find the requested supporting documentation.  We believe the circumstances at

Clinton Towers reinforces the propriety of the recommendation from our initial report, and the need for corrective action.

- York Hill – We reviewed one of the two applicants who had been approved by HPD to move into a studio unit from January through October 2016.  Although the applicant was selected for a unit, there were 61 applicants higher on the waiting list.  For each of the 61 applicants, there were notations why they were not provided with the next available unit, which HPD officials should have reviewed.  However, HPD provided evidence that they reviewed confirming documentation for only 17 of the 61 applicants.  They did not have documentation for the remaining 44 applicants.  We visited York Hill and found that management there had evidence to support the notations for all 61 applicants who were passed over.  Specifically, we observed proof of mailing from the United States Postal Service, letters indicating that applicants were no longer interested, and applications which exceeded income limits.  Nonetheless, without reviewing this documentation, HPD had limited assurance that applicants were justifiably passed over.

82.   Waiting lists available to the public show that the names of vast numbers of applicants have been crossed off, purportedly because they did not respond to letters from the housing companies advising them that they were eligible to apply for an available apartment.

83.   For example, the Adee Towers external waiting list for one-bedroom apartments includes sixty-six (66) names added since July 2012.  Of those sixty-six (66) applicants, almost half – thirty-two (32) – bear the notation "letter sent – NR" next to their names, indicating that those applicants did not respond to letters when they were sent.

84.   In and of itself, this fact is sufficient to put HPD on notice of possible, if not probable, irregularities in the allocation process at Adee Towers.  Because of the high desirability of Mitchell-Lama apartments, it is extraordinarily unlikely that fully half of those whose names are on waiting list would not bother to respond when notified that apartments had become available.

85.     Upon information and belief, HPD has failed to ensure that housing companies keep records of letters sent to applicants, including the date the letters were sent, making it impossible to determine if letters actually were sent and if the entries on the waiting lists are accurate.

86.     Statements by City officials demonstrate that they were, or should have been, aware of substantial, widespread, persistent failures in Mitchell-Lama buildings to follow proper procedures in offering vacant apartments to those on waiting lists, succession rights and other related matters.

87.     In or about February, 2016, the City Council Committee on Housing and Buildings held hearings regarding Mitchell-Lama developments.  Upon information and belief, the hearing was the first on the subject of Mitchell-Lama apartments in approximately seven (7) years.

88.     Brooklyn Borough President Eric Adams gave prepared testimony.  He stated, among other things, that Mitchell-Lama boards and housing companies "have run amok, playing by their own rules."  Furthermore, HPD has "allowed housing companies to defy the rules regarding apartment allocation, financial reporting and contracting."

89.     At the same hearing, testimony established that since 2008, three separate audits (including the two described above from 2008 and 2015, and a third by a state inspector general) have shown "many Mitchell-Lama developments fail to comply with rules governing admissions to vacant apartments, such as by failing to follow the order of applicants on the waiting list."

90.     Assistant Commissioner Julie Walpert testified that "HPD ensures applicants who have been wrongly skipped receive priority for the next opening" – a band-aid approach that fails completely to account for the systemic failures described in the outside audits as well as HPD's own internal audits.

91.     Testimony at the hearing also revealed that HPD had discontinued its training program for Mitchell-Lama board members.  When asked why HPD discontinued the program, Assistant Commissioner Walpert answered, "Resources."  When asked if HPD requested more resources to continue the program, Ms. Walpert conceded, "We did not, no."

92.     HPD's abdication of its oversight responsibilities has also allowed outright fraud and criminality to occur inside Mitchell-Lama developments.

93.     In May, 2019, the Brooklyn District Attorney announced that "three women who controlled the process by which prospective buyers applied for high demand cooperative apartments at the Luna Park Housing Corporation, a Mitchell-Lama complex in Coney Island, have been named in a 78-count indictment in which they are charged with conspiracy, grand larceny, forgery and other charges, including accepting approximately $874,000 in bribes to get apartments for ineligible applicants."

94.     As the District Attorney pointed out, the defendants' conduct "cheated people who were entitled to apartments that instead went to those willing to pay bribes."  In October, 2017, the Brooklyn District Attorney arrested three additional persons who had obtained apartments at Luna Park by paying bribes and by falsely claiming that they were entitled to succession rights to apartments in that development.  Again, the District Attorney stated, correctly, that the defendants' "alleged actions deprived honest, law-abiding home seekers a chance to obtain affordable housing, so we will now seek to bring these defendants to justice for their respective roles in this alleged corrupt scheme."

**Individual Plaintiffs Facts**

95.     In 2012, Plaintiff Astacio applied for a 2-Bedroom unit in Adee Tower while paying an application fee.  Later that year Astactio was notified that she would be placed on the waiting

list, and was added to the list with her correct address and two correct phone numbers.  Notations on the waiting list reflect that Astacio was sent a letter on January 8, 2016, informing her that a unit was available.  The waiting list also contains the notation "NR" reflecting that she did not respond to the letter.  However, Astactio did not, and still has not, received any notice regarding either the available apartment, nor her removal from the waiting list.

96.     In 2014, Plaintiff Berry applied for a 2-Bedroom unit in Adee Tower while paying an application fee.  Later that year Berry was notified that she would be placed on the waiting list, and was added to the list with her correct address and correct phone number.  Notations on the waiting list reflect that Berry was sent a letter on October 19, 2017, informing her that a unit was available.  Berry did not receive any such letter, but instead was contacted by phone in the Fall of 2017 by a representative from Adee Management Office asking if Berry was still interested in a 2-Bedroom unit as one was available.  Berry asked if she could view the unit before committing to it, and was told that would not be possible.  Berry refused to commit to the apartment on the call without a viewing.

97.     Despite Berry receiving a phone call that did not resolve the issue with her application, the Adee Tower waiting list contains the notation "NR" reflecting that she did not respond to a notification letter.[5]  However, Berry did not, and still has not, received any written notice regarding the availability of the apartment, nor her removal from the waiting list.

98.     In 2011, Plaintiff James applied for a 3-Bedroom unit in Atlantic Terminal II while paying an application fee.  Later that year James was notified that she would be placed on the waiting list, and was added to the list with her correct address and phone number.  Notations on

---

[5] A separate potential notation is "REJ" for "Applicant Rejected."  Berry did not reject an apartment in the development but to the extent that Adee Management Office may have believed that she did, they declined to so note this on the waiting list.

the waiting list reflect that James was sent a letter on March 4, 2015, informing her that a unit was available.  The waiting list also contains the notation "N/R" reflecting that she did not respond to the notification.  However, James did not, and still has not, received any notification regarding either the available apartment, nor her removal from the waiting list.

99.    In 2009, Plaintiff Salas applied for a 1-Bedroom unit in Cadman Towers (Cadman Plaza North) while paying an application fee.  He was placed on the external one bedroom waiting list at Number 291, with his address and phone number which are the same today.  Notations on the waiting list reflect that Salas was removed at some point after his name was placed on the waiting list, on the purported grounds that he did not pay the application fee (a substantial number of other applicants' names were also crossed off, ostensibly because they did not pay the application fee either).  The notation was inaccurate and Salas should not have been removed from the waiting list arbitrarily.

100.    There are substantial problems with the management of Cadman Towers.  Upon information and belief, at least four Cadman Plaza North apartments are unlawfully owned by persons who do not occupy the apartment as their primary residence.  Those apartments, by law, must be taken back by the building and offered to qualified applicants but because of the unlawful conduct of the building managers and others, and because of the deliberate indifference of HPD to this unlawful conduct, the apartments remain off the market.

101.    In addition, upon information and belief, occupants of at least two apartments at Cadman Plaza North do not qualify because their incomes exceed those permitted under the Mitchell-Lama Rules.  Building managers know or should know that these occupants do not qualify for their apartments, but because of their misconduct and because of HPD's deliberate

indifference to this (and many other) management problems, these apartments remain off market even though they should be offered to qualified applicants.

## CLASS ALLEGATIONS

102.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of a class defined as follows:

> All persons who, anytime after January 1, 2009, (i) were placed on a waiting list for a Mitchell-Lama development and were subsequently removed from the list on the basis that they did not respond to a notification when in fact the development did not attempt to provide the notification, and/or (ii) were otherwise removed from the waiting list arbitrarily, and/or (iii) were denied the opportunity to apply for, and occupy, apartments to which they were otherwise entitled because of their place(s) on the Mitchell-Lama waiting lists.

Excluded from the Class are: (i) Defendants and their officers, directors and agents; and (ii) the Judge presiding over this action.

103.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

104.    The members of the Class are so numerous that joinder of the members of the Class would be impracticable.  On information and belief, the Class numbers in the thousands.

105.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individuals.  Such common questions of law or fact include, *inter alia*:

A.    Whether Defendants engaged in the conduct alleged;

B.    Whether Defendants' conduct violated 42 U.S.C. § 1983;

C.    Whether Defendants' conduct deprived Plaintiffs of "any rights, privileges or immunities secured by the Constitution and laws";

D.    Whether Defendants were acting "under color of any statute, ordinance,

regulation or usage" when engaged in the challenged conduct;

E.    Whether Plaintiffs and members of the Class have been damaged and, if so, the measure of such damages; and

F.    Whether Plaintiffs and members of the Class are entitled to equitable relief, including, but not limited to, being reinstated on the waiting lists they were improperly removed from, and the institution of proper monitoring and oversight to ensure that notice is given to all Mitchell-Lama applicants as required by the Due Process Clause of the Fourteenth Amendment.

106.    Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs and the Class were injured through the substantially uniform misconduct described above.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

107.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in civil rights and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

108.    A class action is also warranted under Fed. R. Civ. P. 23(b)(2), because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.  Defendants have directed, and continue to direct, their conduct in a uniform manner by failing to implement and oversee protections for applicants on Mitchell-Lama wait lists.  Therefore, injunctive relief on a class-wide basis is necessary to remedy continuing harms to Plaintiffs and the members of the Class caused by Defendants' continuing misconduct.

109.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other detriment suffered by Plaintiffs and the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.  Even if members of the Class could afford individual litigation, the court system should not be required to undertake such an unnecessary burden.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## TOLLING OF STATUTES OF LIMITATIONS

110.    Discovery Rule:  Plaintiffs' and Class members' claims accrued upon discovery that they had been improperly removed from the waiting lists.  While Defendants knew and concealed these facts, Plaintiffs and the Class could not and did not discover these facts through reasonable diligent investigation until after they discovered them by, among other things, reviewing Mitchell-Lama waiting lists made available through the State Freedom of Information Law ("FOIL").

111.    Active Concealment Tolling:  Any statutes of limitations are tolled by Defendants' knowing and active concealment of the facts set forth above.  Defendants were well aware of the issues with the Mitchell-Lama waiting lists through, *inter alia*, the State and City Comptrollers' audits, their own internal audits and public testimony and hearings.  Defendants kept Plaintiffs and all members of the Class ignorant of vital information essential to the pursuit of their claim, without

any fault or lack of diligence on the part of Plaintiffs. The details of Defendants' efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class, and await discovery. Plaintiffs could not have reasonably discovered these facts, nor that Defendants failed to disclose that Plaintiffs were being passed over, as Defendants failed in their obligation to assure Plaintiffs were so informed.

112.   Estoppel:  Defendants are and were under a continuous duty to inform Plaintiffs and members of the Class if they were removed from the wait list and the reason for such removal. At all relevant times, and continuing to this day, Defendants knowingly, affirmatively, and actively concealed the fact that Plaintiffs had been improperly removed from the waiting list without receiving required notice. The details of Defendants' efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class, and await discovery. Plaintiffs reasonably relied on Defendants' active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

113.   Equitable Tolling:  Defendants took active steps to conceal and misrepresent material facts relating to Plaintiffs' claims. The details of Defendants' efforts are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Therefore, should such tolling be necessary, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Due Process**
**(On Behalf of the Class)**

114.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 113 as if fully set forth herein.

115.    42 U.S.C. § 1983 creates a cause of action on behalf of "any citizen of the United States or other person within the jurisdiction thereof" who has been deprived of "any rights, privileges or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation or usage."

116.    Defendants are "persons" acting "under color" of City and State law within the meaning of 42 U.S.C. § 1983.

117.    Plaintiffs have a property interest under state law in their place on the waiting list and the Mitchell-Lama unit that would be available to them once they reached the top of the list and demonstrated suitable qualifications (income threshold and family composition) for an apartment.  Plaintiffs acquired this property interest through, *inter alia*, their payment of a non-refundable application fee.

118.    Plaintiffs were deprived of this property interest without sufficient notice or an opportunity to be heard.  Providing Plaintiffs with notice that they were being passed over on the waiting list on the ground that they did not respond would not have constituted a substantial burden for Defendants.

119.    Defendants have thus deprived Plaintiffs of a property interest without due process of law, in violation of the 14th Amendment to the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.      Certifying the Class under Federal Rule of Civil Procedure 23;

B.      Appointing Plaintiffs as Class Representative and Plaintiffs' Counsel as Class Counsel;

C.      Awarding Plaintiffs and the Class actual, compensatory, nominal damages and punitive damages as appropriate;

D.      Awarding Plaintiffs and the Class appropriate declaratory and injunctive relief;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses pursuant to pursuant to 42 U.S.C. §§ 1988; and

F.      Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a trial by jury on all claims so triable.

Dated:  December 5, 2019                Respectfully submitted,

**THE SULTZER LAW GROUP, P.C.**
By: /s/ *Jason P. Sultzer*
Jason P. Sultzer
Michael Liskow
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel.: (845) 483-7100
Facsimile: 888-749-7747
sultzerj@thesultzerlawgroup.com
liskowm@thesultzerlawgroup.com

Arthur G. Larkin
**HALE & MONICO, LLC**
The Woolworth Building
233 Broadway, Suite 820
New York, New York 10279
Tel: (646) 858-1180
alarkin@halemonico.com

Dennis Kelly, Esq.
David Grossman, Esq.
**KELLY & GROSSMAN, LLP**
1248 Montauk Highway
West Islip, New York 11795
Tel: (631) 314-4996
Fax: (516) 686-6771
dkelly@kellyandgrossman.com
dgrossman@kellyandgrossman.com

John O'Hara, Esq.
**JOHN O'HARA, ESQ.**
579 61st Street, Apt. 2-I
Brooklyn, NY 11220

*Attorneys for Plaintiffs*